UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

SOILY APARICIO SANTOS


                            Petitioner,

   -against-                                          **PETITION FOR A WRIT OF
                                                          HABEAS CORPUS**

EMILY WILLIAMS, SUPERINTENDENT OF THE
TACONIC CORRECTIONAL FACILITY


                            Respondent.

-----------------------------------------------------------------X

Petitioner, Soily Aparicio Santos, by and through her attorney, Thomas E. Scott,

Esq., as and for her petition seeking a writ of habeas corpus pursuant to 28 USC 2254

respectfully alleges as follows:

### SYNOPSIS

1.   Following a trial in Suffolk County Court before Justice S. Anthony Senft, Jr. in

September 2018,[1] a jury convicted the petitioner of attempting to murder her newborn

son Nelson in a basement room of a house at 98 Eastwood Boulevard, Centereach, New

York (the *"Eastwood house"*) as well as attempted assault in the first and second degree

and endangering the welfare of a child.

2.  On November 1, 2018, Justice Senft sentenced the petitioner to sixteen years'

incarceration.  The petitioner appealed her conviction to the Appellate Division, Second

Department, that reduced her sentence to ten years, but in all other respects affirmed the

judgment of the lower court.  *People v. Santos*, 200 A.D.3d 1075 (2021) The New York

---

[1] Pertinent trial transcripts are annexed as Exhibit 1.  As set forth below, the court also conducted a
*Huntley/Mapp/Dunaway/Peyton* hearing.  The transcript of the hearing is annexed as Exhibit 2.

State Court of Appeals denied her application for leave to appeal. *People v. Santos*, 38 N.Y.3d 1010 (2022).[2]

3.   The petitioner's motion to reargue the decision and order of the Appellate Division was fully submitted on <u>February 28, 2022</u>.  The Appellate Division denied the motion on <u>August 6, 2025</u>.[3]

4.   As set forth above, the petitioner was convicted in Suffolk County Court, which is within the Eastern District of New York (*"E.D.N.Y."*).  Therefore, the E.D.N.Y. is an appropriate venue for this action pursuant to 28 U. S. C. 2241 (d).  The petitioner is incarcerated at the Taconic Correctional Facility, 250 Harris Road, Bedford Hills, New York.  As indicated above, the respondent Emily Williams is the Superintendent of that facility.

<u>Petitioner's Background</u> [4]

5.   Born in Honduras, the sixth of fifteen children in her family with a sixth-grade education, no job skills, no history of drug or alcohol abuse and no criminal records save for an entry indicating that she was stopped by the Border Patrol in Texas in 2014 attempting to illegally enter the United States.

6.   When she was about thirteen, she entered into a relationship with Nevis *"Mesa."*  They lived together and had two children Sadie and Nevis, but she and the children returned home after Mesa was shot and killed.  There followed a relationship with Ronald Enrique,

---

[2] The decisions of the Appellate Division dated December 29, 2021 and the Court of Appeals dated April 19, 2022 are annexed as Exhibits 3 and 4.

[3] The papers submitted in support of and in opposition to that motion are annexed as Exhibits 5 and 6. The decision denying leave to appeal is annexed as Exhibit 7. The papers submitted in support of the motion do not include the Exhibits to the supporting affirmation, since the affirmation exhibits are also exhibits to this petition.

[4] The information regarding the petitioner's background is derived from her pre-sentence report, which is annexed as Exhibit 8.

who fathered the petitioner's daughters Ashley and Gretchen, their relationship ending with the petitioner's second pregnancy.

7.  Luis Sr. met the petitioner in Honduras where he fathered the petitioner's daughter Emily.  Thereafter, he facilitated the petitioner and Emily's illegal entry into the United States and lived with them at the Eastwood house with his sister *"Celia"* Saldano and Celia's mother Elena.  During that time Luis, Sr, fathered the petitioner's special-needs child Luis, Jr., with that pregnancy ending the relationship between the petitioner and Luis Sr., who was at some point deported.

8.  The petitioner also had a relationship with Nelson Maute, the father of the petitioner's daughter Brittany, and her son Nelson, who the petitioner allegedly attempted to murder.

<u>Nelson is Born and the First Responding Officers Clear the Petitioner of Wrongdoing,
Luis, Jr. Joins His Mother and Newborn Brother Nelson at SBH</u>

9.  On September 15, 2017, the petitioner gave birth to Nelson at 6:00 AM in a basement room in the Eastwood house that she shared with Emily and Luis, Jr, by the light of a signal-less cell phone.  When the petitioner gave birth, her daughter Brittany and Celia's mother Elena lived in the basement.  Celia lived upstairs and had access to the basement by an internal stairway.

10.  After the petitioner gave birth, Celia came downstairs to the birth room, made certain observations and called 911 and reported that there was a <u>possible</u> childbirth in the basement apartment and that the mother was <u>possibly</u> suffocating the baby.

11.  As a result, Police Officer Shaun *"Sullivan"* responded to the Eastwood house and as directed, proceeded to the right-side entrance[5] and knocked on the door.  Celia poked her head out of the front door and told Sullivan that there was a child born downstairs,

---

[5] An external door leading to a stairway to the basement.

the mother had <u>possibly</u> put a pillow over the baby's face and that the door to the basement was open.

12.  Sullivan returned to the right-side entrance hearing a baby crying he descended the stairs into the darkened basement and at some point switched on his flashlight He proceeded to a cracked open door, pushed it open and observed a baby on the floor "swaddled[6] in a blanket covered with blood" with blood on the floor and blood on the petitioner's legs.

13.  Sullivan summoned paramedics waiting nearby in an ambulance, who quickly responded with paramedic Troy Anthony "Baker" scooping up Nelson and taking him to the ambulance that transported Nelson and the petitioner to Stony Brook Hospital ("SBH").  Nelson was alert and healthy with no visible signs of trauma and was not crying.

14.  Sullivan questioned Emily, who denied her mother did anything to hurt the baby or that her mother put a pillow over the baby's head.  Sullivan also observed Luis, Jr. in the basement.

15.  When Police Officer "Tarquinio" arrived on the scene, Sullivan dispatched him to SBH to check on Nelson's welfare.  Tarquinio informed medical personnel of the allegation that the petitioner may have attempted to suffocate Nelson.

16.  When Sullivan and Sergeant "Luppens," attempted to speak with Celia a second time, she was uncooperative and slammed the door on the officers.

17.  At SBH a doctor informed Tarquinio that there was no evidence of trauma to Nelson,

---

[6] When asked to describe what he meant by swaddled, Sullivan testified - while making a crossing motion - that: "The baby was on top of the blanket and the blanket was wrapped over one way and then wrapped over a second way." See Exhibit 1-A p.113, l. 22 to p. 114, l. 2.

which Tarquinio relayed to Sullivan.[7]  The first-responding officers, including Sullivan and Luppens, determined that no crime had been committed and opened the scene at 8:06 AM.[8]  The finding that no crime had been committed is reflected in Sullivan's Field Report[9] which indicates *"Negative Foul Play."*

18.  At 12:39 PM, Sullivan returned to the Eastwood house on a sick-child 911 call.  An ambulance took the sick child - Luis, Jr. - to SBH, and Sullivan observed that the birth room had been cleaned.

> Child Protective Services (*"CPS"*) Notifies the Special Victims Unit (*"SVU"*) of the Suffolk County Police Department that the Petitioner Attempted to Suffocate Nelson, SVU Detective Michael *"Williams"* Takes a Statement from Celia Without an Interpreter, Interviews Emily, Who Does Not Implicate Her Mother, and Interrogates the Petitioner, Who - After Three Denials - Purportedly Admits to Attempting to Suffocate Nelson

19.  After Sullivan and his crew determined that no crime had been committed, Celia apparently repeats her allegations to a CPS worker and CPS relays an unequivocal allegation to the SVU that the petitioner had attempted to suffocate Nelson.  As a result, Williams responded to the Eastwood house at 2:45 PM and took Celia's written statement although he does not speak Spanish and Celia speaks *"very little"*[10] English and testified at trial using a Spanish interpreter.

20.  At some point, Williams called SBH and had the petitioner's scheduled 4:00 PM

---

[7] Nelson's records from SBH are annexed as Exhibit 9. . At trial Nelson's medical records were admitted as Exhibit 27. The records annexed as Exhibit 9 were obtained from Lockwood. They are numbered 1 to 195 with one unnumbered page, so that they can easily compared with the trail exhibit. And if the People opine that there is a difference between Exhibit 9 and the trial Exhibit 27, the petitioner would not object to their substituting a copy of the trial exhibit.

[8] When a scene is open, access is not restricted since it is not a crime scene.

[9] A copy of Sullivan's Field report is annexed hereto as Exhibit 10. The report was admitted as trial Exhibit A.

[10] See Exhibit 1B at p. 9, ll. 12-13.

release pretextually delayed,[11] and posted uniformed Police Officer *"Stokes"* outside the petitioner's hospital room to prevent her from leaving.  The petitioner encountered Stokes guarding her room and wept.

21.  Williams also went to CPS in Ronkonkoma and interviewed Emily, who apparently did not incriminate her mother.

22.  Sometime around or after 7:00 PM, Williams met with Police Officer Edwin *"Hernandez"* - assigned to act as a Spanish translator - who introduced Williams and his partner Detective Charles *"Ross"* to the petitioner and interpreted their request that she accompany them to the Sixth Precinct.  After the petitioner purportedly agreed, Williams, Ross, Stokes and Hernandez escorted her out of the hospital.  Then, the detectives placed the petitioner in their vehicle, drove for sixteen minutes to the Sixth Precinct and took the petitioner to interrogation room # 3, an 8' x 10' windowless chamber with handcuffs attached to a wall.

23.  Hernandez rejoined the detectives and the petitioner in the interrogation room and mirandized the petitioner in Spanish using a bilingual Miranda card with the petitioner purportedly waiving her rights and being interrogated by one or both of the detectives with Hernandez translating their questions and her answers.

24.  The petitioner's three denials: (1) the petitioner told her interrogators that she had the baby at 6:00 AM and when Celia came in, she told her to cut the umbilical cord and call an ambulance; (2) when Williams told the petitioner that Celia said she tried to suffocate her baby, the petitioner responded that Celia was lying and the reason she was

---

[11] Williams could not remember what time he called SBH when he testified at the hearing, discussed below, but did testify he called from the scene, presumably the Eastwood house, and that he called SBH about the same time he arranged to have the petitioner's room guarded.

lying was that Celia didn't like her because she had children with a man other than Celia's brother [Luis, Sr.]; and, (3) the petitioner posited the question: Why would I carry the child for nine months and then try to kill him?[12]    But the questioning continued, and, the petitioner purportedly confessed to attempting to suffocate Nelson and gave a written inculpatory statement on a form containing Miranda warnings at 9:05 PM.  The petitioner's signature on the Miranda warnings portion of the statement and on the actual statement is printed and misspelled.[13]

The Consent to Search

25.  At Hernandez' request, the petitioner signed a consent-to-search form which Ross took to the Eastwood house and a *"crime scene investigation"* ensued which uncovered exculpatory evidence, including the pillow the petitioner purportedly used to suffocate Nelson and its pillowcase with the amount of blood on those items inconsistent with their being used to suffocate Nelson.

SBH Medical Records

26. As set forth above, after the petitioner gave birth to Nelson, she and Nelson were transported by ambulance to SBH. Their medical records from that facility are discussed below.

---

[12] Additionally, the petitioner said she didn't want to go to the hospital because she had other children in the apartment.

[13] A copy of  petitioner's statement, written by Williams, is annexed as Exhibit 11.The statement was admitted in evidence as trial Exhibit 24.

*Petitioner's Records*[14]

27. Admission and Discharge:  Page 11 of her records indicate she was admitted at 7:23 AM and was discharged at 7:11 PM (19:11) that same day.

28. Law Enforcement Interaction with the Petitioner:  There are various references to law enforcement interaction with the petitioner including the following:

Page Remarks

3  DSCH STATUS: Court/Law Enforcement

7  Trans or Dschgd to Court/Law Enforcement

10  Fit for confinement

36  Addendum by PESKIN STOLE, Melissa [MD]on September 15, 2017
17:56 [5:56 PM]
I stopped back in to see the patient after being notified the patient was under arrest for possibly smothering her newborn.  There is an officer outside her room.  The pt expresses a lot of concern that her children were taken away because her mother, who was supposed to take care of her children while she was at the hospital, left them alone.

…She will remain in house. Discharge retracted

101  Nursing Final Discharge Note ….
Accompanied By:  Legal Authorities
Patient Discharge Transportation:  Other:  legal vehicles…
Nursing Discharge Note:  Pt discharged and escorted with police officers

122  Nursing Discharge Note:  Pt discharged and escorted with police officers
SW [social worker?] and Nurse Manager has been informed 6th precinct
[sic] is currently enroute to hospital and will be taking MOB into custody.

---

[14] The petitioner's medical records -which are annexed hereto as Exhibit 12 - were received in evidence as Exhibit B at the hearing on August 22, 2018 (see Exhibit 2-B at pp. 4-.5).  The undersigned obtained a copy of these records from Lockwood. Somewhat inexplicably the copy provided is marked as Exhibit O with evidence sticker in indicating the records were marked on August 22, 2018, but not as Exhibit "B" and, therefore, not consistent with the minutes of the hearing. It is not clear from the sticker that the records were received in evidence, but the minutes indicate that they were. The records are certified and except for certain initial documents including the certification and a cover letter to the County Court are numbered 1 to 188.

130  Patient Discharge Transportation:  Other: legal vehicles

29.  Pain:  While all notations concerning the petitioner experiencing pain during the approximately twelve hours, she was a patient at SBH are not entirely consistent, a fair reading of her records indicates that she was in fact experiencing pain and that she was given ibuprofen 600 mgs for that condition.  See pages 7, 13, 35, 66, 94, 96, 97, 100 and 113.

30.  Status of Nelson:  "baby in NICU doing well"

31.  Transportation Home by Taxi:  The records indicate that the petitioner was going to be sent home by taxi until Dr. Melissa Peskin Stole "retracted" her discharge as indicated above.  References to her taxi can be found on pages 8 and 124 of the petitioner's records.

32.  Lack of Prenatal Care:   An issue in this petition is the prosecution's attempt to denigrate the petitioner for her failure to seek prenatal care while pregnant with Nelson. This issue is addressed at page 124 of the petitioner's records as follows:
SW questioned patient lack of prenatal care. Patient reports she spent majority of the last year at St. Mary's Chidren's Hospital with her three year old son [Luis, Jr.] who is at home with a trache and gtude[15]. Patient reports this is why she wants to be discharged today, as the nursing staff does not cover weekends and she needs to be home to take care of him….

It is also worth noting that p 132 of the petitioner's records indicates that her baby is not up for adoption.

33.  Accusations against the petitioner:  The petitioner's records indicate that the petitioner attempted to smother her baby (see pages 122, 129).  The source of these allegations - when that source is identified - is Celia.  The records also indicate that the petitioner's daughter [Emily] was also a witness at page 122).  This is inaccurate since as set forth below first-responding Police Officer Sullivan interviewed Emily who denied that her mother did anything to hurt the baby and denied that she put a pillow over the baby's head.  Additionally, Williams interviewed Emily, but Willaims did not testify that Emily incriminated the petitioner.

34.  Petitioner's Children Removed from her Home: See page 122 of petitioner's medical records.

_____

[15] According to the website of the Children's Hospital of Philadelphia "[a ]gastrostomy tube, often called a G tube, is a surgically placed device used to give direct access to your child's stomach for supplemental feeding, hydration or medicine. G tubes are used for a variety of medical conditions, but the most common use is for feedings to enhance your child's nutrition. When a child is unable to eat enough food by mouth, a G tube helps deliver enough calories and nutrients to support their growth."

*Nelson's Records*

35.  Nelsons medical records do not support the allegation that the petitioner attempted to smother him shortly after his birth, since there is no indication that Nelson sustained trauma or an impairment of his respiratory system.

36.  On page 7 of his records, the allegation that the petitioner tried to suffocate the baby is reported followed by the notation: "On arrival, the child was crying, with good inspiratory and expiratory effort.  Airway: Intact. Breathing:  Bilateral breath sounds with mild wheeze on left side, difficult to distinguish from crying."  That page further indicates that the baby was in "no apparent distress."

37.  Page 9 contains the notation "hypothermic but otherwise appears well, no evidence of trauma on physical exam."  Page 10 contains the notation "no acute distress, alert and responsive, …"

38.  That Nelson had no labored breathing or respiration is noted at pages 11, 14 17 and 20.

39.  There is a pertinent entry on page 22 of Nelson's records, which is set forth as follows:

> Confusing hx [history?] about immediate events post delivery:
>
> Maternal intention to harm baby vs. maternal intention to provide warmth

Indictment # 1910-2017

40.  Following her arrest, a grand jury indicted the petitioner for attempted murder in the second degree, attempted assault in the first and second degrees and endangering the welfare of a child with Nelson being the putative victim of those crimes that purportedly occurred on September 15, 2017.

> *The Huntley/Mapp/Dunaway/Peyton* Hearing Conducted on July 20, 2018, July 23, 2018 and August 22, 2018 Before Justice Mark Cohen

41.  The People called Sullivan and Hernandez who testified consistent with the above narrative and Police Officer Robert *"Strandvold,"* whose testimony about maintaining a scene log was irrelevant to the hearing issues.  Hernandez also testified that he lost his memo-book entries pertaining to the events of September 15, 2017.  Williams testified

consistent with the above narrative and during cross-examination also testified he stationed officers[16] outside the petitioner's hospital room *"[b]ecause based upon my conversation and the statement that I had from Celia I had probable cause that a crime had been committed"[17]* and the purpose of stationing officers outside the petitioner's room was to prevent her from leaving.

42.  ADA Shauna *"Kerr"* was not familiar with the *Dunaway* rule.  Petitioner's counsel Scott *"Lockwood"* sought an adverse inference with respect to the People's failure to call Stokes prompting Kerr to argue that *"[w]hether or not [the petitioner] is in custody [at SBH] is irrelevant in the sense that she waives her Miranda rights and voluntarily speaks to the offices at the precinct,"[18]* thereby demonstrating her unfamiliarity with *Dunaway v. New York*, 442 U.S. 200 (1979), which held that if a defendant is detained or arrested without probable cause his or her statements - including those made after Miranda warning - must be suppressed since the taint of the illegal detention is not - absent an attenuation[19] - cured by Miranda warnings.[20]

---

[16] As set forth below it was only one officer whose name is Stokes.

[17] Exhibit 2 -A, at p. 238. ll. 6-8.

[18] Exhibit 2-B, p.

[19] Which was not present in our case.

[20] Kerr's statement demonstrating she was unfamiliar with the *Dunaway* rule while conducting a *Dunaway* hearing may explain why she did not attempt to prove the existence of probable cause for the petitioner's detention prior to her allegedly incriminating statement, may be why Kerr did not even attempt to prove the existence of probable cause through competent evidence, which, for the reasons set forth below did not exist.

<u>Justice Cohen's Decision Dated September 4, 2018 that Denied Suppression of
The Petitioner's Statements and Physical Evidence Recovered in or Around the
Eastwood House[21], Finding:</u>

43.  (a) The petitioner was not in custody when she made her first inculpatory statement at the Sixth Precinct although that occurred: hours after Williams delayed her scheduled 4:00 PM discharge from SBH and posted Stokes outside her hospital room to prevent her from leaving; and, sometime after the officers removed the petitioner from the hospital, transported her to the Sixth Precinct and brought her to interrogation room # 3; and, (b) the petitioner's statements were admissible since she was properly mirandized and waived her rights.  But Justice Cohen made no findings as to whether the petitioner's statements were voluntary, in the sense that her decisions to waive her rights and speak to the officers were freely made, although there were facts and circumstances discussed below, that indicate this was not the case.  Justice Cohen declined to take an adverse inference from the People's failure to call Stokes and Dr. Peskin-Stolze, who made an entry in the petitioner's hospital records indicating that she was notified that the petitioner was under arrest and cancelled her discharge[22] or to take an adverse inference because Hernandez lost his memo-book entries.

44.  Justice Cohen's opinion misstates the hearing testimony indicating that: (a) Tarquinio relieved Sullivan and remained to hold the scene (see, p. 2, ¶ 7 of Justice Cohen's decision), when, in fact, Sullivan sent Tarquinio to SBH to check on Nelson's welfare; and, (b) Strandvold relieved Sullivan *"and continued to 'hold the scene'"* (p. 3, ¶11) which is equally inaccurate since Sullivan opened the scene at 8:06 AM and Strandvold didn't

---

[21] The decision is annexed as Exhibit 13.

[22] Thia entry is on page 36 of the petitioner's hospital records and is quoted above.

close the scene until over seven hours later. More significantly, Justice Cohen opines that although Williams delayed the petitioner's discharge from SBH, "the Defendant was not in custody since she remained simply at the hospital awaiting discharge" (p. 3, ¶ 11), ignoring Williams' testimony that he posted Stokes outside the petitioner's hospital room to prevent her from leaving and that the petitioner was aware of her confinement, encountering Stokes and weeping - with the petitioner not free to leave once Stokes started guarding her room until her formal arrest at the Precinct (and thereafter).

45. According to the opinion, [although the petitioner] indicated that she had *"some 'minor pelvic and hip' difficulty,* she never asked for medical attention or indicated that she was in pain,"* which is also inaccurate since we learned at trial that what the petitioner said when being questioned by the officer filling out her *"Prisoner Activity Log"* - with Hernandez translating - was that *"…she has pelvic/muscle pain from giving birth this morning…."* with the word *"minor"* being added by Hernandez during the hearing and at trial, but only coming to light at trial, and the word *"pain"* omitted by Hernandez at the hearing, raising the question of whether the ruling that the petitioner's statements were admissible was based on false or knowingly false testimony.

> <u>The Trial Conducted Before Justice Senft and a Jury on September 12, 14, 17, 18, 21, 24, 26, 2018</u>

46. Sullivan testified consistent with the above narrative, including that he and Luppens made a determination of *"Negative foul play,"* but was not permitted to testify that Emily exculpated her mother.[23]

47. Baker testified as set forth above, including that Nelson was alert, healthy, with no

---

[23] Sullivan was not permitted to testify to the content of the equivocal 911 transmission or Celia's equivocal statement as to what occurred -set forth above – after Lockwood objected to same as hearsay.

bruising or facial injuries.  Kerr elicited testimony that the petitioner declined to hold Nelson during the ambulance ride, beginning her campaign of asking the jury to draw prejudicial inferences from facts that do not support them and to denigrate the petitioner because of who she is rather than prove the crimes charged in the indictment with relevant and admissible evidence.

48.  Tarquinio testified consistent with the above narrative, including that a SBH doctor determined that Nelson was uninjured, which is consistent with Nelson's hospital records.

49.  Celia testified: (a) the petitioner was her brother's girlfriend;[24] (b) she knew the petitioner from their country of origin [Honduras]; (c) the petitioner told Celia that she was pregnant a month or a month and a half prior to Nelson's birth; and, (d) the petitioner looked like she was pregnant.

50.  Celia further testified that on the morning of Nelson's birth, Celia awakened by the sound of a baby crying went to the petitioner's room where she saw *"like a reflection or something, I can't really tell, that she tried to cover the child with it, so she didn't let me see the baby"* [T: p. 15, ll. 7-21] and the petitioner was on the floor with the silent baby between her legs and a cell phone in one hand and *"[in] the other hand she had something that she was using to cover the baby,"*[25] and when Kerr showed her the pillow, that something became that pillow and Celia testified that the petitioner covered the baby with the pillow, and in response to Kerr's leading question, agreed that the baby was underneath the pillow.

51.  When Kerr asks Celia: *"what type of characters are on that pillow case?"* Celia

---

[24] Her brother being Luis, Sr., Emily and Luis, Jr.'s father.

[25] See Exhibit 1-B, p. 19, ll. 19-21.

responds: *"Truthfully, I don't know what is the name of that character,"* but later agreed

with Kerr that it was a Troll character on the pillowcase.[26]

52.  Strandvold initiated and maintained a scene log at the Eastwood house (admitting

that the log erroneously indicates that he secured the scene at 1:10 PM when, actually, it

wasn't secured until 3:10 PM).  Justice Senft allowed Strandvold to testify he closed the

scene to prevent tampering with evidence but did not permit Lockwood to bring out that

the scene had been open and unprotected for seven hours and tampering was possible

(and actually occurred since the birth room had been cleaned).

53.  Hernandez testified to the above-described narrative and was cross-examined

concerning the loss of his memo-book entries and his failure to promptly report the loss

as required by departmental regulations and testimony is elicited that when he did notify

the department the District Attorney's Office helped him in that endeavor.

54.  Williams testified to the above-described facts with the court permitting him to state

that the Child Protective Services referral was *"that an infant had been smothered by her*

*mother with a pillow,"* overruling Lockwood's objection to this blatant hearsay which was

far more than was necessary to *"complete the narrative[27]"* and inconsistent with Celia's

equivocal statements to Sullivan and the 911 operator.

55.  *"Clarissa"* Castillo - employed by a charitable organization - assisted the petitioner in

various ways such as scheduling medical appointments, arranging for transportation and

referring the petitioner to a parent training class.  When Lockwood objects to testimony

---

[26] See Exhibit 1-B, p,21,ll. 8-18.

[27] Testimony that he responded to the Eastwood house based on a referral from Child Protective Services
would have served that purpose.

about parent training class[es] the petitioner may not have taken, Kerr opines she should be permitted to introduce this evidence since she has to prove the endangering charge beyond a reasonable doubt and Justice Senft denies Lockwood's application to preclude the testimony and for curative instructions.

56. Clarissa also testified she was present when the CPS worker called the SVU and when an ambulance removed one of the petitioner's children [Luis, Jr.].

57. Retired Crime-Scene Police Officer Maryanne Hauswirth testified to recovering various items at the Eastwood house, including a pillow and pillowcase, which Molly Philip – employed by the Suffolk County Crime Laboratory - testified she examined for the presence of blood – and found one blood stain on the pillow and one on the pillowcase, which she cut out and saved for future investigation, thereby tampering with critical evidence.

58. The testimony of Medical Examiner Michael Jeffrey "*Caplan*" indicates – in effect - that it would have been possible to attempt to suffocate Nelson without causing physical injuries, with Justice Senft overruling Lockwood's objection that he was not qualified to render this opinion.

59. Defense witness Dr. Adiel Fleischer - the chief of maternal/fetal medicine for high-risks obstetrics at Long Island Jewish Hospital (with other impressive credentials) - testified that the amount of blood on the pillow and pillowcase was inconsistent with those objects being used to smother Nelson since if the pillow and pillowcase were used for that purpose and if Nelson were covered with a pillow for a period of several minutes "I would see a lot more blood on the pillow."[28] and Nelson would have localized trauma and

---

[28] See Exbibit 1-F, p. 39, ll. 22-23.

respiratory issues and there was none, (although Lockwood's efforts to elicit this testimony were thwarted by Justice Senft, it was established by Baker's testimony and Nelson's hospital records).   Fleischer concluded that, in his opinion, there was no evidence of suffocation.

60.  Kerr pursues a line of questioning about prenatal care, including office visits, vitamins, the safest place to give birth (a hospital) with all objections overruled.

61.  On September 26, 2018, the jury convicted the defendant-appellant of attempted murder in the second degree, attempted assault in the first degree, attempted assault in the second degree and endangering the welfare of a child.

62.  On November 1, 2018, Justice Senft sentenced the petitioner to 16 years' incarceration for her conviction for attempted murder in the second degree as well as concurrent sentences of 8 years' incarceration for her conviction for attempted assault in the first degree, 1 1/3 to 4 years' incarceration for her conviction for attempted assault in the second degree and 1 year incarceration for her conviction for endangering the welfare of a child.

## THE APPEAL

Briefs[29]

63.  The petitioner perfected an appeal of her judgment of conviction submitting a brief dated February 17, 2021 containing the Points described below:

In Point I of her brief the petitioner argued that based on the testimony elicited at the above-described *Huntley/Mapp/Dunaway/Peyton h*earing, the petitioner's statements

---

[29] The petitioner's brief is annexed as Exhibit 14 the People's opposition brief is annexed as Exhibit 15 and the petitioner's reply brief is annexed as Exhibit 16.

should have been suppressed by Justice Cohen and should be suppressed by the Appellate Division, since: (a) Justice Cohen erroneously found that *"Defendant was not considered in custody until 8:35 p.m., when she made the first inculpatory admission, after she received and waived her Miranda rights"* (see p. 8 of his decision dated September 4, 2018), in fact, was in custody around or after 4:00 PM, when Williams pretextually delayed her release from the hospital and posted Stokes - an armed uniformed police officer - outside of her hospital room to prevent her from leaving,[30] with the petitioner aware of her detention weeping when she encountered Stokes; (b)  in *Dunaway v. New York*, *supra,*[31] the Supreme Court held that since arrests are seizures that must be supported by probable cause,[32] statements made by a defendant after an arrest or detention that is not supported by probable cause must be suppressed and that Miranda warnings do not cure the taint of an illegal arrest unless there is an attenuation between that arrest and the defendant's subsequent statement;[33] and (c) therefore, the People had the burden at the hearing of establishing that there was probable cause for

---

[30] Additional indicia that the petitioner was in custody include Williams' hearing testimony that he had probable cause to arrest her based on Celia's statement, and that the petitioner was not free to leave when he escorted her to his vehicle outside the hospital.  Consider further that the petitioner was escorted from her hospital room by two detectives (Williams and Ross) and two uniformed police officers (Hernandez and Stokes) and then taken by the detectives to the Sixth Precinct.

[31] *Accord, Brown v. Illinois,* 422 U.S. 590 (1975).

[32] Notwithstanding the limited exception to the probable cause standard carved out in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968), which permitted a *"stop and frisk"* on less than probable cause since a stop and frisk is far less intrusive than an arrest and is limited to specific circumstances and is not what occurred here.

[33] The court cited as an example of a sufficient attenuation the fact pattern in *Wong Sun v. United States*, 371 U.S. 471 (1963) in which an illegally arrested defendant was arraigned and after being released on his own recognizance returned to give a voluntary confession, finding the arraignment and the defendant's voluntary return sufficient to dissipate the taint of the illegal arrest.

the petitioner's arrest or detention, before she was arrested or detained at SBH; and, (d) the People failed to do so.

64. Additionally, (a) although Williams testified he took a statement from Celia which he felt gave him probable cause to arrest the petitioner, that was a determination for the court to make after hearing the relevant evidence, including the substance of Celia's statement (or viewing the actual written statement) and the facts and circumstances concerning how her statement was taken[34]  Since, *inter alia*, that evidence was not presented at the hearing, the People did not meet their burden under *Dunaway*, and the petitioner's subsequent mirandized statements must be suppressed. *People v. Johnson*, 66 N.Y.2d 398, (1985) (defendants statements suppressed since his arrest was not supported by probable cause and there was no attenuation between his illegal arrest and subsequent statements).

65. And there is evidence that Celia's statement did not furnish probable cause for the petitioner's arrest since: (a) it is contradicted by her earlier equivocal statements on the 911 tape and to Sullivan that the mother was possibly trying to smother her baby; Celia made her observations in a dark basement where Sullivan used his flashlight; (b) Williams - who does not speak Spanish – took a statement from Celia who speaks very little English (and judging by her trial testimony has trouble communicating even using an

---

[34] This left open a number of possibilities including that when Williams spoke with Celia, she was somewhat incoherent or furtive, deceptive, inarticulate or unclear, confused or addled.  Additionally, *"where it can be shown that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures, the presumption of probable cause may be overcome."*  *Hernandez v. State,* 228 A.D.2d 902, 904, (3rd. Dept., 1996).  Did Williams follow proper procedure in obtaining Celia's statement?  We know he didn't use a translator, and Celia does not speak English fluently and also know that Williams disregarded the determination of the responding uniformed police officers – Sullivan, and Luppens - that no crime had been committed. Did Williams confront Celia with her earlier equivocal, contradictory statement?  Or ask her why she refused to speak to the responding officers a second time.  The hearing record is silent on these issues.

interpreter, since she gave an unexpected answer that should have caused a mistrial);
(c) Celia refused to cooperate with the responding uniformed officers slamming the door
shut when they tried to speak with her a second time; and, (d) as suggested by the
petitioner during her interrogation, Celia harbored ill will toward the petitioner because of
the petitioner's relationship with Celia's brother (Luis, Sr.), who fathered Emily and Luis,
Jr., and her subsequent relationship with Matute, who fathered Nelson, suggesting this
wasn't the typical case of a citizen complainant.[35]

66.    Justice Cohen stated during the hearing - in words or substance - the standard to be
applied to determine whether a person is in custody is "*what a reasonable man, innocent
of any crime, would have thought had he been in the defendant's position,.*" a rule
enunciated by the Court of Appeals in *People v. Yukl*, 25 N.Y.2d 585, 589 (1969).  It is
submitted that this inquiry is not applicable to our case, since there is nothing in the record
to suggest the petitioner was not in custody at SBH, during her ride to the Sixth Precinct
and while at that facility under the rule of *Dunaway*, which   - as indicated by the following
excerpt from that case -- mirrors the fact pattern in our case:

> Petitioner was not questioned briefly where he was found.
> Instead, he was taken from a neighbor's home to a police car,
> transported to a police station, and placed in an interrogation
> room.   He was never informed that he was "free to go";
> indeed, he would have been physically restrained if he had
> refused to accompany the officers or had tried to escape their
> custody. The application of the Fourth Amendment's
> requirement of probable cause does not depend on whether
> an intrusion of this magnitude is termed an "arrest" under state
> law.   The mere facts that petitioner was not told he was under
> arrest, was not "booked," and would not have had an arrest
> record if the interrogation had proved fruitless, while not

---

[35] … *[T]he fact that an identified citizen accused an individual who was known to her of a specific crime,
while generally sufficient to establish probable cause, does not necessarily establish it"* and fails to where
there are "*materially impeaching circumstance or grounds for questioning the complainant's credibility.*"
*Medina v. City of N.Y.*, 102 A.D.3d 101, 104 (1st Dept., 2012*).*

insignificant for all purposes, (citation omitted) obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in Terry [*Terry v. Ohio*, 392 U.S. 1 (1968), which permits a stop and frisk on less than probable cause] and its progeny. Indeed, any "exception" that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are "reasonable" only if based on probable cause.
*Dunaway v. New York*, supra, at pp. 212-213.

67. It is submitted that under *Dunaway* the petitioner was in custody once a guard - with instructions to not permit her to leave - was posted outside her hospital room. If not, then when she was made to accompany the officers - while not free to leave - to interrogation room 3 in the Sixth Precinct.

68. In <u>Point II</u> of her brief the petitioner sought the suppression of evidence seized in and around her apartment, which claim was withdrawn by the petitioner in her motion to reargue since relevance of various items seized by the police was not established during the petitioner's trial and the pillowcase and pillow seized exculpated the petitioner since the amount of blood on those items was not consistent with their being used to suffocate Nelson. Therefore, the petitioner is not pursuing this claim in the instant petition.

69. In <u>Point III</u> the petitioner argued that her statement should have been suppressed pursuant to *People v. Huntley*, 15 N.Y.2d 72 (1965): As the People did not prove beyond a reasonable doubt that the petitioner's waiver of her Miranda rights and subsequent statement were voluntarily made, and the record would suggest that they were not since the petitioner a thirty-two-year old undocumented alien, who had given birth in a basement apartment that morning without medical or any other type of assistance, who was in pain from the childbirth, whose only other involvement with the law was a run in with the Border Patrol three years earlier, who was concerned about her other children

being taken from her, who was aware of the police officer guarding her room and that she was a prisoner, who was being interrogated by two detectives and a police officer, did not freely and voluntarily waive her rights and agree to speak with the officers. The petitioner is pursuing this claim here.

70.  In Point IV of her brief the petitioner argued that Lockwood's application for a mistrial based on Celia's testimony that Elena told Celia that the petitioner had murdered her baby should have been granted and Justice Senft's direction to the jury to disregard that testimony was entirely inadequate to ameliorate the prejudice caused by Celia's false testimony[36], which the jurors could have considered as substantive evidence of the petitioner's guilt and which if the falsity of the statement were laid bare would have substantially and negatively impacted Celia's credibility. The petitioner pursuing this claim in so far as it demonstrates that she was denied her fundamental right to a fair trial, a violation of the due process clause of the Fourteenth Amendment and that the petitioner's guilt was not proven beyond a reasonable doubt.

71.  In Point V of her brief the petitioner argued that Justice Senft erred when he admitted the testimony of Medical Examiner Caplan since he was not qualified to render an opinion that a newborn could be smothered for up to five minutes without causing injuries, ignoring the cases cited by Lockwood including *Romano v. Stanley*, 90 N.Y.2d 444 (1997*); Kaplan v. Karpfen*, 57 A.D.3d 409 (1st Dept., 2008); *Browder v. N.Y.C. Health & Hosps. Corp.*, 37 A.D.3d 375 (1st Dept., 2007) and *Adjetey v. Jewish Home Lifecare*, 2014 NY Slip Op 32101(U) (Sup. Ct., Bronx County, 2014), which broadly stand for the proposition a witness should not be permitted to testify outside the field of his or her expertise without

---

[36] Which was about a statement made by Elena, who did not testify at trial.

demonstrating additional qualifications with *Romano v. Stanley*, *supra*, holding that a *"clinical, forensic pathologist whose specialty is the performance of autopsies"* was not qualified to render an opinion concerning *"manifestations of intoxication in live individuals."* [37]  And since Caplan was equally unqualified to render his opinion that - in effect - the petitioner could have attempted to smother Nelson with a pillow without causing injury and it was egregious error for Justice Senft to permit this testimony despite counsel for the petitioner citing the above cases indicating that his testimony should have been precluded.  The petitioner pursuing this claim in so far as it demonstrates that the petitioner's guilt was not proven beyond a reasonable doubt and that she was denied her right to a fair trial guaranteed by the due process clause of the Fourteenth Amendment.

72.  In <u>Point VI</u> the petitioner argued that the judgment cannot stand since the evidence was insufficient to prove the petitioner's guilt beyond a reasonable doubt and that she was denied her fundamental right to a fair trial.

73.  Proof Beyond a Reasonable Doubt:  The petitioner's guilt was not proven beyond a reasonable doubt since the first-responding officers, after speaking to Celia and after ascertaining that Nelson was uninjured, cleared the petitioner of any wrongdoing.  Then Williams arrested the petitioner after he took a statement from Celia although he does not speak Spanish and Celia speaks very little English (and testified at trial through an interpreter) and took a statement from the petitioner under circumstances indicating that it was a coerced, false and inadmissible.  Additionally, Celia's earlier statements concerning what occurred on the morning of September 15, 2017 at the Eastwood house were equivocal as was at least a portion of her critical trial testimony; and expert testimony

---

[37] At p. 452.

furnished by Dr. Fleisher exculpated the petitioner.  There was, therefore, a reasonable doubt as a matter of law.  *People v. Ledwon*, 153 N.Y. 10, 22 (1897)  (*"[g]uilt in such a case cannot be established beyond a reasonable doubt by the testimony of such a witness, who is, evidently, either from moral or mental defects, irresponsible"*);  *People v. Foster*, 64 N.Y.2d 1144, 1147 (1985) (witness testimony "*involved hopeless contradictions"[38]*); *New York v. Deschessere*, 69 A.D. 217 (1st Dept., 1902) (conviction cannot be based on unreliable, inconsistent and contradictory testimony); *People v. Boukris*, 50 Misc. 3d 927,932 (County Ct., Sullivan County, 2015) (*"[w]ithout evaluating the credibility or veracity of the complainant's testimony in the instant matter, this court finds that as a matter of law, the victim's testimony was inherently contradictory"* ).  The petitioner is pursuing this in the instant application.

74.  Fundamental Fairness:  The defendant was denied her fundamental right to a fair trial guaranteed under New York State law and by the Fourteenth Amendment.  [see, e.g. *People v. Crimmins,* 36 N.Y.2d 230 (*1975)*; *People v. Ramos*, 33 A.D.2d 344 (1st Dept., 1970).[39]  The petitioner is pursuing this claim in so far as it demonstrates that her guilt was not proven beyond a reasonable doubt and that it constitutes a violation of the due process clause of the Fourteenth Amendment.

 75.  In Point VII the petitioner argued that her sixteen-year sentence was excessive and should be reduced in the interests of justice.  Since it was reduced by the Appellate Division to ten years this is somewhat of a moot point, although any incarceration of the

---

[38] Quoting *People v. Ledwon*, *supra*. Internal quotation marks omitted.

[39] Although this power is apparently limited to appellate courts. *People v. Carter*, 63 N.Y.2d 530, (1984).

petitioner as a result of the proceedings in the state courts is unjust and unwarranted. The petitioner is not pursuing this claim here.

76.  In their opposition brief dated June 22, 2021, the People argued that although there was probable cause to arrest the petitioner at SBH, she was not placed in custody until after she made her first incriminating statement at the 6th Precinct, opining that she was not in custody under the standard set forth in *People v. Yukl*,[40] *supra*, which is: "*what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position*"[41] without citing addressing or distinguishing *Dunaway v. New York*, *supra*, which mandates that the petitioner's statements be suppressed since the fact pattern in our case is virtually the same as in *Dunaway* in that the police detained the petitioner without probable cause and took her to a police facility where after being mirandized she purportedly made admissions.  But in our case, the facts supporting a conclusion that the petitioner was in custody are more compelling since Williams pretextually delayed the petitioner's release from SBH and posted a guard outside of her hospital room to prevent her from leaving and the petitioner was aware of the guard and his assignment.

77.  The People further contend that Celia's statement to Williams provided probable cause for her arrest although the actual statement was not entered into evidence at the hearing and no evidence was elicited concerning the facts and circumstances of Williams taking Celia's statement including how Williams communicated with Celia since he does not speak Spanish, and she speaks very little English.  It is the petitioner's position that

---

[40] While not citing that case.

[41] At p. 589.

for the reasons set forth above Williams did not have probable cause to arrest her until after she made her first incriminating and coerced statement and that her statements which were the product of her illegal detention and must be suppressed under the rationale of *Dunaway* [42] (and *Miranda*).

78. The People also argued in an entirely conclusory manner that the petitioner's statements were voluntarily made although the circumstances surrounding the petitioner's statements including that she was an undocumented alien, who was in pain from giving birth earlier that day, whose parental rights were in jeopardy, hospitalized at the same hospital where two of her children were being treated, whose only other involvement with the law was a run-in with the Border Patrol in 2014, without money or a cell phone and possibly shoeless, none of which was meaningfully addressed by the People who instead relied on platitudes concerning the petitioner's waiver of her Miranda warning which is meaningless unless the petitioner was capable of knowingly and intelligently waiving her rights and actually did so.

79. With respect to the testimony of Celia indicating that Elena said that the petitioner killed her baby, the People contend that Justice Senft's striking that testimony and instructing the jury to disregard it was sufficient to ameliorate any resulting prejudice. This was not the case since Justice Senft never told the jury that Celia's testimony was false although ADA Kerr's statements to Justice Senft indicate that based on her pretrial interviews of Celia the answer she expected was Celia's mother made an innocuous

---

[42] At the hearing the People did not attempt to show that Williams had probable cause to arrest or detain the petitioner and Williams' testimony concerning the statement he took from Celia was elicited somewhat serendipitously during cross examination. But Williams did testify that he confronted the petitioner with Celia's accusations. It is apparent that this did not include her equivocal statements to the 911 operator and Sullivan.

inquiry as to whether the petitioner gave birth thereby indicating that Celia's testimony was false.

80.  And Justice Senft could have taken various measures to ensure that the petitioner received a fair trial, including granting counsel's application for a mistrial, questioning Celia outside the presence of the jury, inquiring whether as suggested by Kerr that Celia's false testimony may have been the result of a translation error or informing the jury that Celia told Kerr during trial preparation that Elena merely made the above-described innocuous inquiry. Instead, Justice Senft chose a course of action that was the most prejudicial to the petitioner's right to a fair trial.

81. The petitioner addressed the People's arguments in her reply brief.

The Decision of the Appellate Division[43]

82. On December 29, 2021, the Appellate Division affirmed the petitioner's conviction finding:

    a.  She was not in custody while at the hospital or at the Sixth Precinct prior to making an inculpatory statement thereby ignoring the *Dunaway* decision and the evidence in the record of overt coercion and that prior to being removed from the hospital by the police, a guard was placed outside of her hospital room to prevent her from leaving;[44]

    b.  the defendant knowingly and intelligently waived her Miranda rights without addressing or acknowledging those facts in the record which suggest otherwise;

---

[43] See Exhibit 3.

[44] Which was not included in the Appellate Division decision.

c.  that the lower court properly denied the defendant's application for a mistrial, although for the above-stated reasons Justice Senft mishandled the petitioner's application for that relief;

d.  that the lower court properly allowed Caplan to testify in an area outside of his field of expertise without citing or addressing the case law set forth by the petitioner - indicating that Caplan's testimony should have been precluded; and,

e.  that the evidence presented at trial supported the defendant's conviction, although the evidence was in reality entirely insufficient to establish the petitioner's guilt beyond a reasonable doubt with the statements and testimony of Celia - the petitioner's chief accuser - a muddle of contradictions and inexplicable inaccuracies or falsehoods (such as her testifying that her mother told her that the petitioner killed her baby), during a trial in which unfairness abounded including Kerr's impermissible use of leading questions and her assault on the petitioner for not giving birth to Nelson in a more middle-class manner with Kerr justifying her attacks on the petitioner by her plaintive plea that - after all - she had to prove the petitioner endangered Nelson's welfare beyond a reasonable doubt.

83. And, as set forth above, the Court of Appeals denied the petitioner's application for leave to appeal and the Appellate Division denied her motion to reargue[45].

## AEDPA

84. The Antiterrorism and Effective Death Penalty Act of 1996 (*"AEDPA"*)[46] governs and restricts petitions by state prisoners for federal habeas relief by, *inter alia*, requiring that

---

[45] See Exhibits 4 and 7.

[46] 28 U.S. C. § 2254.

in order to obtain such relief the state court proceedings either "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or, "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented."

85.  But AEDPA constraints do not apply where a state court decision does not resolve a federal claim that was presented to it, and a habeas court will afford *de novo* review to the claim.  *Hodge v. Mendonsa*, 739 F.3d 34, 41 (1st Cir., 2013); *Clements v. Clarke*, 592 F.3d 45 (1st Cir., 2010).[47]

86.  AEDPA also contains a requirement that a petitioner exhaust his or her remedies in state court before seeking habeas relief.  Here, the petitioner has fulfilled that requirement by perfecting an appeal in the Appellate Division, seeking leave to appeal to the Court of Appeals and seeking to re-argue the decision of the Appellate Division since *"[f]ederal habeas review does not demand that a petitioner in every case ask the state for collateral relief where he has already fairly presented the claim and the evidence on direct appeal."* *Gunter v. Maloney,* 291 F.3d 74, 82, *citing Brown v. Allen*, 344 U.S. 443 (1953).

## GROUNDS FOR HABEAS RELIEF

A. The Petitioner's Statement Should Have Been Suppressed Pursuant to *Dunaway v. New York, supra*

87.  Justice Cohen who conducted a pre-trial suppression hearing - which he characterized as a *"Huntley and Mapp Dunaway hearing with a Peyton issue thrown in"* - declined to suppress the petitioner's statements since he found that she was not in

---

[47] But that rule also has an exception since a presumption may arise that a federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289 (2013).

custody until after she was mirandized and made an oral admission at the Sixth Precinct notwithstanding that the petitioner's release from SBH was pretextually delayed by Williams who had Police Officer Stokes guard the petitioner's hospital room to prevent her from leaving and when the petitioner encountered Stokes she *"started crying and went back into her room."*[48]    Thereafter, the petitioner was escorted from SBH by four officers, placed in a police vehicle with two of those officers for a sixteen-minute ride to the Sixth Precinct, where she was taken to a windowless 8' x 10' interrogation room with handcuffs affixed to a wall.

88.  Justice Cohen did not confront the *Dunaway* issue head on in that he made no findings as to why the not-free-to-leave petitioner was not in custody when she - like the defendant Dunaway - *"agreed"* accompanied the detectives to the precinct where she was placed in an interrogation room and questioned.  Justice Cohen's opinion does not cite *Dunaway* or contain legal analysis as to why the petitioner's statements should not be suppressed pursuant to that decision.  Relying instead on the innocent reasonable man rule set forth below.

89. The Appellate Division found that *"the defendant was not in custody while at the hospital, nor when she was subsequently at the police station, prior to making an inculpatory statement [since] [u]nder these circumstances, 'a reasonable person, innocent of any crime, would [not] have believed she was in police custody,'"*[49] - citing *People v. Delfino,* 234 A.D.2d 382 (2nd Dept. 1996) and *People v Fox,* 123 A.D.3d 844 (2nd Dept., 2014).  Like Justice Cohen, the Appellate Division did not cite *Dunaway* or

---

[48] Exhibit 2-B,  p.20, l.20.

[49] *People v. Santos, supra,* at p. 1076.

address *Dunaway* issues including why the petitioner was not in custody for the reasons set forth above, such her guarded hospital room and her custodial transportation to the interrogation room in the Sixth Precinct.

90. In *Dunaway*, the Supreme Court did not agonize over whether a reasonable, innocent person in Dunaway's circumstances would have felt he or she was in custody, rather the court focused on the conduct of the police in detaining Dunaway without probable cause.

91. In *People v. Rodney P.*, 21 N.Y.2d 1,11 (1967), the New York State Court of Appeals adopted a standard different than that set forth in *Yukl*, finding "*the [United States] Supreme Court intended that the [Miranda] warnings [which are required when there is custodial interrogation] be given when the questioning takes place under circumstances which are likely to affect substantially the individual's 'will to resist and compel him to speak where he would not otherwise do so freely.'*"[50]  The-above quoted excerpt from *People v. Rodney P. supra*, is based on the rationale of the decision of the U. S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436 (1966) - the seminal case on custodial interrogation - wherein the court held [*"b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way;*[51]" and "*[u]nless adequate protective devices are employed to dispel the compulsion inherent in custodial surroundings, no statement obtained from the defendant can truly be the product of his free choice.*"[52]

---

[50] This maxim was quoted with approval in *People v. Shivers*, 21 N.Y.2d 118 (1967) and *People v. Phinney*, 22 N.Y.2d 288 (1968).

[51] Miranda, at p.444.

[52] *Ibid.* at p.458.

92.  And in considering the reasonable man rule *vis a vis* the *Dunaway* decision, it is appropriate to examine the decisions of the United States Supreme Court dealing with the reasonable man rule including *Berkemer v. McCarty*, 468 U.S. 420 (1984) and *Howes v. Fields*, 565 U.S. 499 (2012).

93.  In *Berkemer* a trooper pulled over the petitioner's vehicle and questioned him briefly before placing him under arrest.  As to the question of whether the petitioner was in custody before being placed under arrest the court held *"the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation"*[53] and found that the petitioner's statements made after the trooper stopped his vehicle, but before his arrest were non-custodial and admissible.  Significantly, the court focused on the suspect rather than a hypothetical man innocent of any wrongdoing.  The court also cited the basic rule of Dunaway that custodial interrogation means *"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."* [54]

94.  In *Howes v. Fields*, *supra*, the Supreme Court revisited the reasonable man rule in a case involving the interrogation of a prison inmate[55] holding that:

> As used in our *Miranda* case law, "custody" is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion.  In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, (citation omitted) a reasonable person [would] have felt

---

[53] At p. 442. Emphasis supplied.

[54] At p.428.

[55] Since the case involved an inmate, it could be argued that as such the defendant was in custody by virtue of being incarcerated, a rule the court did not adopt.

> he or she was not at liberty to terminate the
> interrogation and leave. (Citation omitted.)

At pp. 508-509.

95. Factors to be weighed in reaching that determination include the location and duration

of the questioning or interrogation, statements made during the interview, the presence

or absence of physical restraints and the release of the person being interviewed at the

end of the interview.  Here, the petitioner questioning took place in an interrogation room

with handcuffs affixed to a wall, the petitioner purportedly made admissions and was,

thereafter, arrested.

96. The court went on to note that:

> Determining whether an individual's freedom of movement
> was curtailed, however, is simply the first step in the analysis,
> not the last. Not all restraints on freedom of movement amount
> to custody for purposes of *Miranda*. We have "decline[d] to
> accord talismanic power" to the freedom-of-movement
> inquiry, *Berkemer*, 468 U.S., at 437, 104 S. Ct. 3138, 82 L. Ed.
> 2d 317, and have instead asked the additional question
> whether the relevant environment presents the same
> inherently coercive pressures as the type of station house
> questioning at issue in *Miranda*. … (Emphasis supplied.)

At p.509.

97. Here, the petitioner purportedly confessed during precisely the type of station house

questioning at issue in *Miranda*.  More particularly, she confessed in above-described

interrogation room # 3 at the Sixth Precinct.  Addressing other criteria set forth in *Fields*

including statements made during the interview and the release of the person being

interviewed, the petitioner purportedly made admissions when interrogated and was,

thereafter, arrested.  Indeed, her arrest was a foregone conclusion since Williams

testified, he had probable cause to arrest the petitioner although probable cause was not

established at the hearing and - it is submitted - in light of all the attendant circumstances

33

- did not exist.   And it is further submitted that the record indicates that a suspect in the petitioner's position would not have felt free to terminate the interrogation and leave, and like defendant Dunaway the petitioner would have been detained if she tried to do so.

98.  Summary:  To the extent the reasonable man rule set forth in the cases cited by the state courts conflicts with the rule of *Dunaway* either generally or as applied here it cannot supersede *Dunaway*, a decision of the Supreme Court.   Since the People failed to prove probable cause for the petitioner's detention at SBH or on her trip to or at the Sixth Precinct, prior to her purported admissions, the petitioner's coerced statements must be suppressed.   The reasonable man rule as set forth in the Supreme Court's decisions in *Berkemer v. McCarty*, *supra* and *Howes v. Fields*, *supra* also requires that result.

99.  But even if the *Yukl* rule is applicable - which it is not since *Dunaway* controls - the petitioner's statements must still be suppressed since what reasonable man or woman would not believe that they were in custody if an armed uniformed police officer was guarding their hospital room to prevent them from leaving.  And as to the issue of probable cause, the hearing court found that probable cause was provided by the petitioner's first admission and the Appellate Division did not disturb that finding.   Therefore, there has been no judicial determination that probable cause existed prior to the petitioner's first purported admission.

100.  A Procedural Issue:  Neither the hearing court nor the Appellate Division addressed the petitioner's *Dunaway* claim since both relied on the rule set by the Court of Appeals in *People v. Yukl, supra*, that whether a defendant is in custody is determined by the inquiry: *"what a reasonable man, innocent of any crime, would have thought had he been*

*in the defendant's position."[56]* It is the petitioner's position that the state courts' reliance

on the rule of *Yukl* in derogation of the Supreme Court's decision in *Dunaway* entitles the

petitioner to habeas relief and since the state courts failed to address the petitioner's

*Dunaway* claim this Court is not bound by the strictures of AEDPA and may review the

petitioner's claim *de novo* [*Gunter v. Maloney, supra*, *citing Brown v. Allen*, *supra*] which

is what the petitioner requests.

101. It is the petitioner's position that the state courts erred in failing to suppress the

petitioner's statements since: (a) to the extent that there is a conflict between the courts'

decisions in *Yukl et al* and *Dunaway* either generally or in applying the decisions to our

case, *Dunaway* -  a decision of the Supreme Court - must prevail; and under the rule of

*Dunaway,* the petitioner's statements must be suppressed since, if anything, the police

conduct towards the petitioner,  including pretextually delaying her release from SBH and

posting an armed uniformed officer outside of her hospital room to prevent her from

leaving before *"requesting"* she accompany the detectives to the Sixth Precinct, was more

indicative of the petitioner being in custody than the fact pattern in *Dunaway*.

B.  The Petitioner's Statements Should be Suppressed as Involuntary

102.  The federal courts have long enforced the Fifth Amendment's prohibition against

self-incrimination with respect to pre-trial statements to the police in federal cases.  *Bram*

*v. United States*, 168 U.S. 532, 549 (1897).  The Fifth Amendment's prohibition against

self-incrimination was extended to the states through the Fourteenth Amendment in

*Malloy v. Hogan*, 378 U.S. 1 (1964), which involved a defendant being compelled to testify

---

[56] At p. 589.

before a court-appointed referee and held the petitioner could invoke his Fifth Amendment privilege against self-incrimination.

103.  And in *Miranda v. Arizona, supra* - which established the requirement of the famous warnings - the court held "*the Fifth Amendment privilege is available outside of criminal court proceedings and serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves …[since] without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.* " [57] *See also*, *Jackson v. Denno*, 378 U.S. 368, 380 (1964) ("*[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined*").

104.  Here, there is ample evidence in the record indicating that the petitioner's statements were not voluntarily as that term is defined in *Miranda* and its progeny including that: (a) she was an unemployed, uneducated, undocumented alien, without money, a phone and possible shoeless (b) she gave birth that morning to Nelson without medical assistance at 6:00 AM; (c) as a result she was in pain;  (d) (she made her first oral admission after she was advised of her rights at 8:10 PM. (e) she was removed from SBH by two armed uniformed police officers and two detectives, placed in a police vehicle with the two detectives and driven for sixteen minutes to the Sixth Precinct where the detectives placed her in an interrogation room;

---

[57] At p. 467.

and, (f) two of her children Nelson and her special-needs son Luis, Jr. remained at SBH under circumstances indicating her parental rights were in jeopardy.

105.   It is submitted that these factors militate in favor of a finding that although she purportedly waived her Miranda rights, her admissions were coerced and involuntary, since the mere incantation of the warnings does not mean that a statement is voluntary, as that determination must be made in light of all of the attendant circumstances [*Haynes v. Washington*, 373 U.S. 503, (1963))] which here compel the opposite conclusion.

C.   The Petitioner's Guilt Was Not Proven Beyond a Reasonable Doubt

106.   The Due Process Clause of the Fourteenth Amendment requires that in a criminal prosecution a defendant's guilt be proven beyond a reasonable doubt.  In the case of *In re Winship*, 397 U.S. 358, 362 (1970), the Supreme Court applied this requirement to juvenile delinquency proceedings where the accused is charged with a criminal offense, noting that *"[e]xpressions in many opinions of this Court indicate that it has long been assumed that proof of a criminal charge beyond a reasonable doubt is constitutionally required."* See also, *Miles v. United States*, 103 U.S. 304,312 (1880) (*"[t]he evidence upon which a jury is justified in returning a verdict of guilty must be sufficient to produce a conviction of guilt, to the exclusion of all reasonable doubt"*); *Davis v. United States, 160 U.S. 469, 488, (1895)* (*"the vital question from the time a plea of not guilty is entered until the return of the verdict, is whether upon all the evidence, by whatever side adduced, guilt is established beyond reasonable doubt"*). [58]

107.   Here, it is apparent that the prosecution has not met that burden since their proof consisted largely of the testimony of Celia and the petitioner's coerced admissions.  The

---

[58] *Cf. United States v. Greene*, 834 F.2d 1067 (District of Columbia Circuit, 1987); *Rouse v. People of the Virgin Islands*, 78 V.I. 717 (2024).

testimony of Celia who initially told the 911 operator and Sullivan that the petitioner possibly suffocated Nelson and whose trial testimony was, at times, equally equivocal, and was extracted by Kerr using patently leading questions.  And Celia falsely testified at trial that her mother told her the petitioner murdered Nelson when according to Kerr - based on her interviews with Celia - the answer she was expecting was an innocuous inquiry as to whether the petitioner had her baby.

108. And the first-responding officers who investigated Celia's 911 call and who determined that Nelson was not injured, found that no crime had been committed.  Then along comes Williams who takes a statement from Celia although he does not speak Spanish, and she speaks very little English and based on that statement - with no indication in the trial record that he considered Celia's earlier equivocal statements or the determination of the first-responding officer - conducts an illegal custodial interrogation of the petitioner[59] during he does not accept the petitioner's denials and continues until he extracts a confession. Reasonable doubt abounds.

### D. Due Process Violations

I. An Overview

109.  The admission of prejudicial evidence can give rise to a due process violation. *Payne* v. *Tennessee*, 501 U. S. 808, 825 (1991) ("when *evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief*").  In *Andrew v. White*, 145 S. Ct. 75 (2015), the Supreme Court reversed the defendant's murder conviction and

---

[59] Since Williams did not have probable cause to arrest or detain the petitioner, her interrogation was in violation of the rule set forth in *Dunaway*.

38

death sentence based on the prosecution's introduction of evidence concerning the defendant's sexual conduct and demeanor as well as her failings as a mother and a wife, holding that rule of *Payne* that the introduction of irrelevant and prejudicial evidence can create a due process violation was a holding of the court, and, therefore, a predicate for a habeas petition under AEDPA (which requires as one predicate for a habeas petition that it be based on a holding of the Supreme Court).[60]

   II. Kerr Elicited Irrelevant and Prejudicial Testimony

110. Here, there was irrelevant and prejudicial evidence introduced suggesting that the petitioner was an unloving, unfit mother since she refused to hold Nelson during the ambulance ride to SBH and did not adhere to the discretionary protocols of some middle class or wealthy expectant mothers such as taking parental training classes and vitamin regimens with Kerr arguing that she should be permitted to elicit this evidence since she had to prove the crime of endangering the welfare of a child beyond a reasonable doubt and that the petitioner didn't bother to take parenting classes since she planned on killing her baby.  And what was the relevance of Sullivan testifying that the petitioner's special-needs son Luis Jr. was taken by ambulance to SBH nearly seven hours after the petitioner gave birth to Nelson?  Or was this and the above-described cross-examination an appeal to prejudice against those who live in poverty and squalor and perhaps are of Spanish descent?  And as set forth in the petitioner's medical records, when the petitioner was asked about her lack of prenatal care, she indicated the reason was the time taken with Luis, Jr.'s treatment at a children's hospital.

---

[60] The case was remanded for a determination whether a fairminded jurist could disagree that the evidence so infected the trial with unfairness" as to render the resulting conviction or sentence a denial of due process as to both the finding of guilt and the sentence. At p. 83 (internal quotation marks and related citation omitted).

### III. Lockwood's Motion for a Mistrial

111. Irrelevant and prejudicial evidence was introduced when Celia falsely testified that her mother said that the petitioner murdered her baby. We know the testimony was false since Kerr disclosed that the answer she was expecting - based on Kerr's extensive pretrial interviews with Celia - was that Celia's mother inquired whether the petitioner had given birth.

112. While generally a question of state law "…the decision on whether to grant a mistrial can sometimes impact federal constitutional rights." B*raithwaite v. Garceau*, 2025 U.S. Dist. LEXIS 105740, at p. 8 (E.D. Wis., 2025*). "For example, if a mistrial is requested because of perceived unfairness caused by the admission of evidence or improper argument, and the request is denied, the underlying impropriety might result in the denial of due process.[61]" Perez v. Macauley,* 2023 U.S. Dist. LEXIS 79290, at p.14 (W. D. Mich., 2023).

113. Justice Senft mishandled the petitioner's motion for a mistrial by not granting same or taking other measures to ameliorate the prejudice engendered by Celia's false and extremely damaging testimony such as disclosing that the answer Kerr was expecting - based on her interviews with Celia was that Celia's mother merely inquired whether the petitioner had the baby, not that the petitioner murdered the baby. Additionally, Justice Senft could have conducted an *in-camera* voir dire of Celia and confronted her with Kerr's revelation and perhaps conducted an in-camera voir dire of Kerr.

### IV. Medical Examiner Caplan's Testimony

---

[61] At p. 8. Citing and quoting *Perez v. Macauley,* 2023 U.S. Dist. LEXIS 79290, (W. D. Mich., 2023). at p.14.

114. Was also irrelevant and prejudicial since he was not qualified to testify that the petitioner could have - in effect - attempted to smother Nelson without causing physical injury since - as a medical examiner who conducts autopsies on the deceased – he was not qualified to render that opinion. The cases provided by Lockwood to the court (cited above) stand for that proposition but were disregarded by Justice Senft and the Appellate Division.

V. Cumulative Error

115. In *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973), the Supreme Court held that the cumulative effect of certain evidentiary ruling by the state court required reversal of the defendant's conviction noting " … *"the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process."*

116. Nevertheless, there is a split among the Circuit Courts as to whether the cumulative error doctrine should apply to habeas corpus petitions governed by the AEDPA which requires such petitions to be based on, *inter alia*, "an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." The Ninth and Tenth holding that cumulative error analysis should apply. *Parle v. Runnels*, 387 F.3d 1030 (9th Cir. 2004) (*"[t]he cumulative error doctrine in habeas recognizes that, 'even if no single error were prejudicial, where there are several substantial errors, 'their cumulative effect may nevertheless be so prejudicial as to require reversal.'"[62]*); *Darks v. Mullin*, 327 F.3d 1001,1018 (10th Cir. 2003) (*"[t]he 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent*

---

[62] Quoting *Killian v. Poole*, 282 F.3d 1204 (9th Cir. 2002)

*as a single reversible error*"[63])]. But the Fourth and Eighth Circuits reached a contrary result. *Fisher v. Angelone*, 163 F.3d 835 (4th Cir., 1998); *Wainwright v. Lockhart*, 80 F.3d 1226 (8th Cir. 1996).

117. And the Second and Seventh Circuits permit a cumulative analysis with respect to assessing the ineffective assistance of counsel under the *Strickland* rule [see *Strickland v. Washington*, 466 U.S. 668 (1984)]. *Rodriguez v. Hoke*, 928 F.2d 534 (2d Cir., 1991) ("*[s]ince Rodriguez's claim of ineffective assistance of counsel can turn on the cumulative effect of all of counsel's actions, all his allegations of ineffective assistance should be reviewed together*"[64]). *Williams v. Washington*, 59 F.3d 673, 682 (7th Cir., 1995) ("*a petitioner may demonstrate that the cumulative effect of counsel's individual acts or omissions was substantial enough to meet Strickland's test*"[65]).

118. It is submitted that the common-sense rule that cumulative effect of prejudicial evidentiary rulings may deny a defendant fundamental due process is prudential since at a certain point the effect of accumulated error is inherently prejudicial and unfair. Therefore, the petitioner asks the Court to apply the doctrine of cumulative error in deciding this petition.

## SERVICE

119. It is anticipated that the Suffolk County District Attorney, who prosecuted the petitioner in the state courts, will defend this petition. His name and address are as follows: Honorable Raymond Tierney, Suffolk County District Attorney, Arthur M. Cromarty

---

[63] Quoting *Hooper v. Mullin*, 314 F.3d 1162 (10th Cir. 2002) which quoted *Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002)

[64] Citing *Strickland v. Washington*, *supra*.

[65] Citing *, inter alia, United States ex rel. Kleba v. McGinnis*, 796 F.2d 947 (7th Cir, 1986).

Court Complex, 200 Center Drive, Riverhead, New York 11901. Since Emily Williams, the Superintendent of the Taconic Correctional Facility, is a defendant, it is appropriate to serve her and the New York State Attorney General (as Williams is a state employee). Her address is as follows: Emily Williams, Superintendent of the Taconic Correctional Facility, 250 Harris Road, Bedford Hills, New York 10507-2497. The Attorney General should be served at the following address: Office of the New York State Attorney General, Federal Habeas Corpus Bureau, 28 Liberty Street, New York, New York 10005.

## **CONCLUSION**

120.  It is, therefore, requested that the Court grant the petitioner habeas corpus relief by reversing her conviction and ordering that she be released from confinement or grant alternative relief, including, but not limited to suppressing the petitioner's coerced admissions.


Dated:  Hauppauge, New York
        October 19 , 2025

                              Respectfully submitted,

                              Thomas E. Scott, Esq.